IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-00624-WYD-CBS

WAYNE GLASSER,

                    Plaintiff,

v.

CAROLE KING, RN,
MICHAEL WALSH, PA, and
LT. JAMES HARDING,

                    Defendants.

---

## RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Magistrate Judge Shaffer

        This matter comes before the court on Defendants Carol King, RN,[1] Michael Walsh, PA,

and Lieutenant James Harding's (collectively "Defendants") Motion for Summary Judgment

(Doc. #280), filed on May, 16 2014.  This motion was referred to the Magistrate Judge pursuant

to the Order of Reference (Doc. #12) dated April 20, 2012, and Memorandum (Doc. #282) dated

June 6, 2014.  This court has carefully considered the Motion and related briefing, the entire case

file, the comments offered by the parties during the multiple Scheduling Conferences, Status

Conferences, and Motion Hearings held between June 2012 and March 2014, and applicable case

law.  For the following reasons, I recommend that Defendants' Motion be granted in part and

denied in part.

---

[1] Ms. King was incorrectly identified as "Carole King" in Plaintiff's Complaint.

## FACTUAL ALLEGATIONS

Plaintiff Wayne Glasser, a *pro se* prisoner incarcerated at the Fremont Correctional Facility ("FCF") in Canon City, Colorado, filed this lawsuit pursuant to 42 U.S.C. § 1983 claiming Defendants violated his Eighth Amendment right against deliberate indifference to serious medical needs.  Plaintiff also claims that Defendant Walsh as a licensed Physician's Assistant and Defendant King as a Registered Nurse are liable for professional negligence in the administration of medical attention, and for "outrageous conduct/intentional or negligent infliction of emotional distress."  (Doc. #98 at pp. 12-15).  Plaintiff seeks actual damages for injuries sustained as a result of Defendants' alleged actions, nominal damages, punitive or exemplary damages, and costs and fees.

On the morning of March 26, 2010 at approximately 10:40 am, Mr. Glasser returned to his cell after completing a five-mile run in the recreation yard.  On his return, Plaintiff experienced a sudden spell of dizziness and chest pain.  At approximately 11:00 am the prison cells were locked for the morning's routine count of prisoners.  Plaintiff began to feel worse at this time, noting that his arms were fatigued in addition to feeling light headed and dizzy.  Sergeant Hansen approached Plaintiff's cell at approximately 11:10 am, noticed he had difficulty catching his breath, and asked whether he was well enough for her to leave his cell temporarily.  (Doc. #280 at ¶ 8; Deposition of Jennifer Hansen ("Hansen Deposition"), Doc. #280-2 at TR:6:8-18).[2]  Plaintiff stated that he did not feel well and would need to visit the medical clinic if he did not improve, but asked only that she return to check on him after she completed her portion of the count.  Sergeant Hansen returned to Plaintiff's cell with Officer Aranda and Sergeant Aultman at 11:20 am, at which time Plaintiff complained of "shortness of breath, dyspnea,

---

[2] Sergeant Hansen was known to Plaintiff as Officer Durdin during the time in question.  (*See* Hansen Deposition, Doc. #280-2 at TR:4:21-5:17).

lethargy, dizziness, radiating chest pain, pain and numbness in both triceps, feelings of indigestion," and asked to be taken to the prison's medical clinic immediately.[3] (Doc. #98 at ¶¶ 12-13; Affidavit of Wayne Glasser ("Glasser Affidavit"), Doc. #285-3 at ¶¶ 13, 14). Sergeant Hansen testified that Plaintiff told her he had pushed himself harder than usual in the recreation yard and did not feel well. (Doc. #280 at ¶¶ 11, 12; Hansen Deposition, Doc #280-2 at TR:7:15-20). He also told the three officers that, "even though it seemed unlikely given [his] age and condition, [he] thought [he] was having a heart attack." (Glasser Affidavit, Doc. #285-3 at ¶ 15). They left Plaintiff to seek medical attention for him. Sergeant Hansen telephoned the prison's medical unit and reported that Plaintiff had "tingling, heaviness" in his arms, was generally feeling unwell, and that he "had pushed [himself] harder on the yard...," and wished to be seen by medical staff. (Doc. #280 at ¶¶ 15, 17; Hansen Deposition, Doc #280-2 at TR:7:15-25, 11:7-12).

Defendant King was working behind the desk at FCF's medical clinic on March 26, 2010. Upon receiving Sergeant Hansen's call, King accessed Plaintiff's medical file and consulted his medical history. (*See* Doc. #280 at ¶ 38; Deposition of Carol King ("King Deposition"), Doc. #280-3 at TR:27:14-19). She learned that Plaintiff was a "relatively young man who did not come to clinic, who had no previous medical history with [the clinic] that would give any red flags as to more of an emergency than what [she] was told." (King Deposition, Doc. #280-3 at TR:27:21-24). King directed Hansen to tell Plaintiff that "very often [she] had heard this before with other inmates who … had been in the same situation," and that inmates often overextend themselves, become "dehydrated and fatigued, and that some rest and

---

[3] Plaintiff was trained as a "Radiologic Technologist (X-ray Tech)" and combat medic at the United States Army Academy of Health Sciences. (Doc. #285-3 at ¶ 3). Prior to his incarceration, he worked for several years as a "mobile x-ray technologist," and was trained in electrocardiography, which included the interpretation of [electrocardiograms ("EKGs")] and phlebotomy. (Doc. #285-3 at ¶ 6).

fluids was the first line of recommendations to relieve the situation."   (Doc. #280 at ¶¶ 40, 41; King Deposition, Doc. #280-3 at TR:6:9-16).   She then told Hansen that if Plaintiff failed to feel better, or felt worse, he would be seen when "count was cleared."   (Doc. #280 at ¶ 42; King Deposition, Doc. #280-3 at TR:6:20-24).

The officers instructed Plaintiff that he would be admitted to the clinic after the count. Plaintiff responded that his symptoms persisted and he needed immediate medical attention. Plaintiff also asked Hansen to contact Defendant Harding, the shift commander, so that he might intervene.  (Glasser Affidavit, Doc. #285-3 at ¶¶ 17, 18).   Sergeant Hansen telephoned King a second time, who stated that unless there was a change in Plaintiff's condition denoting an emergency, she would not see him until after count had cleared.  (Doc. #280 at ¶¶ 30-31, 43-45; *see* King Deposition, Doc. #280-3 at TR:7:3-19).  Hansen relayed this information to Plaintiff at 11:30 am.  The count continued for approximately 30 minutes, during which time the officers returned to Plaintiff's cell "three or four times" and Plaintiff continued to request medical attention.  (Glasser Affidavit, Doc. #285-3 at ¶ 21; Doc. #280 at ¶ 9).  Following the count, Plaintiff walked unattended to the medical clinic where he identified himself and stated, "I think I'm having a heart attack." (Glasser Affidavit, Doc. #285-3 at ¶ 23).  King instructed Plaintiff to wait, and she resumed her post behind the clinic desk.  (Doc. #294 at ¶¶ 53-54).

Nurse S. Apodaca, RN saw Plaintiff approximately 20 minutes after he arrived at the clinic and 80 minutes after his initial request for medical assistance.  (*See* Doc. #98 at ¶ 19; Doc. #294 at p. 21).  Glasser told her he was experiencing chest pains and other symptoms consistent with a heart attack, and that he believed he was having a heart attack.  (Glasser Affidavit, Doc. #285-3 at ¶ 26).  Nurse Apodaca administered an EKG and interviewed Plaintiff regarding his medical history before taking the EKG results to Defendant Walsh.  (*See* Doc. #280 at ¶¶ 58-60;

Glasser Affidavit, Doc. #285-3 at ¶¶ 26, 28).   Walsh then "spent several minutes interviewing Plaintiff, reviewing information such as his vital signs and EKG, reviewing Plaintiff's chart, and evaluating which 'different diagnosis might most likely' be the problem."  (Doc. #280 at ¶ 65; *see* Deposition of Michael Walsh ("Walsh Deposition"), Doc. #280-4 at TR:12:1-25).   Walsh informed Glasser that the EKG results indicated he was experiencing a heart attack.  (*See* Doc. #98 at ¶ 20).   Walsh gave Glasser a shot of nitroglycerin and waited 20 minutes before administering a second EKG, which indicated that Glasser was still experiencing a heart attack. (Doc. #98 at ¶ 21).   Plaintiff alleges that Walsh dispatched an ambulance between 15 and 25 minutes later.

Glasser arrived at St. Thomas More Hospital's Emergency Room in Canon City, Colorado at approximately 2:30 pm.   The attending physician determined that Plaintiff was suffering from an acute ST-segment Elevation Myocardial Infarction ("STEMI").  (*See* Doc. #98 at ¶ 25).   After consulting with Dr. Michael Hansa, a clinical cardiologist, and Dr. Stephen MacKerrow, an interventional cardiologist, the attending physician administered a dose of tenecteplase ("TNK") and transferred Plaintiff by helicopter to Parkview Medical Center in Pueblo, Colorado, where Dr. Hansa assumed oversight for his medical care.  (*See id.* at ¶ 26). Dr. Hansa informed Plaintiff that the TNK dose appeared to have cleared his occluded artery, his condition would be monitored over the weekend, and that on Monday an angiogram would be administered and he would possibly undergo a Percutaneous Coronary Intervention ("PCI").  Dr. Hansa then ordered a routine set of lab tests and EKGs for Plaintiff, as well as an echocardiogram.

On Monday morning, Dr. MacKerrow administered the angiogram and learned that the TNK dose had not cleared the occluded artery, Plaintiff's left anterior descending artery was

99% occluded, and Plaintiff had a distal anterior apical and inferoapical aneurysm. (*See* Doc. #
98 at ¶ 29). Dr. MacKerrow performed the PCI, which involved placing a stent in Plaintiff's
mid-left anterior descending artery to restore blood flow.

Mr. Glasser claims the delay in medical attention following his heart attack resulted in
permanent myocardial damage, "akinesis, damage, or death in the hapex and distal anteriolateral
portions" of his heart, "a reduced capacity evidenced by the low ejection fraction," and
"permanent and irreversible" cardiac muscle damage that effects his ability to exercise and
causes him to fatigue easier. (Doc. #294 at ¶¶ 3-5; Affidavit of Dr. Arthur Levine ("Levine
Affidavit") Doc. #285-5 at ¶¶ 1-5; Deposition of Dr. Stephen MacKerrow ("MacKerrow
Deposition"), Doc. #285-7 at TR:9:22-12:25). He now suffers from "regular, persistent
premature ventricular contractions as a direct result of the lack of, or absence of, blood flow to
the myocardium." (Doc. #98 at ¶ 31; Doc. #294 at ¶¶ 8-9; MacKerrow Deposition, Doc. #285-7
at TR:14:7-15:7; Levine Affidavit, Doc. #285-5 at ¶¶ 7-10; Deposition of Dr. Timothy Creany
("Creany Deposition"), Doc. #285-8 at TR:53:3-10). Several doctors opine that this damage has
caused "a psychological impact" and "emotional distress" for Plaintiff. (Levine Affidavit, Doc.
#285-5 at ¶ 11; Creany Deposition, Doc. #285-8 at TR:53:25-54:23).

## PROCEDURAL HISTORY

Plaintiff filed his Complaint on March 12, 2012, naming seven individuals and three
entities as defendants,[4] and purporting to state a variety of state law tort claims and one claim for
violation of the Eighth Amendment.[5] (Doc. #1). He simultaneously filed a motion for leave to

---

[4] Specifically, Plaintiff named Lynn Erickson, Colorado Department of Corrections ("CDOC"), Michael Hansa,
MD, Stephen MacKerrow, MD, Pubelo Cardiology Associates, PC, Correctional Health Partners, and Stephen
Krebs, MD, and Defendants.
[5] Plaintiff claimed "Medical Negligence," "Deliberate Indifference to Serious Medical Needs," "Outrageous (Willful
& Wanton) Conduct/Intentional Infliction of Emotional Distress," "Negligent Infliction of Emotional Distress,"
"Negligent Failure to Train," "Failure to Supervise," "Vicarious Liability," "Negligent Scheduling or Staffing,"
"Negligent Healthcare Management," "Negligent Cost Containment Practices."

6

proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915.  (Doc. #3).  Following a court order directing him to cure certain deficiencies (Doc. #5), Plaintiff filed an Amended Complaint on April 16, 2012 (Doc. #7), adding six defendants[6] and a claim for "Unreasonable Mail Room Policies Hindering the Right to Correspond," and omitting "Negligent Infliction of Emotional Distress."  The court granted Plaintiff's motion for leave to proceed *in forma pauperis* on April 17, 2012.  (Doc. #8).  On April 19, 2012, the court issued an order dismissing the CDOC pursuant to the Eleventh Amendment.  (*See* Doc. #9).

On July 19, 2012, Plaintiff filed a Motion for Waiver of Certificate of Review Requirement, and asked in the alternative that the court appoint counsel for him and extend the deadline for seeking a Certificate of Review.  (Doc. #64).  On August 9, 2012, after the majority of defendants had either answered the Amended Complaint or filed motions to dismiss, Plaintiff moved for leave to file a Second Amended Complaint.  (Doc. #76).  At a Status Conference held on September 5, 2012, this court granted Plaintiff's Motion to Amend and granted his Motion for Waiver of Certificate of Review Requirement, to the extent he sought an extension of time to provide the necessary certificate.  (*See* Doc. #94).

The Second Amended Complaint ("SAC") named the present Defendants as well as Health Service Administrator Lynn Erickson, Michael Hansa, MD, "Deceased, Through Surviving Spouse and Successor, Weera-Anong Hansa," Stephen MacKerrow, MD, and Pubelo Cardiology Associates, PC ("PCA"), and purported to state a claim for "Professional Negligence," "Outrageous (Willful & Wanton) Conduct/Intentional or Negligent Infliction of Emotional Distress," "Negligent Failure to Train or Supervise," "Deliberate Indifference to Serious Medical Needs," "Medical Negligence," and "Negligent Scheduling or Staffing."  (Doc.

---

[6] Plaintiff added Tom Clements, Rae Timme, Ron Wager, Maj. Trevors Filer, Lt. Damian McDougal, and Anthony DeCesaro.

#98).  Lynn Erickson filed an Answer to the SAC on November 8, 2012 (Doc. #102); the present Defendants filed an Answer to the SAC on November 27, 2012 (Doc. #104); and Dr. MacKerrow and PAC filed an Answer to the SAC on November 27, 2012 (Doc. #105).  Ms. Erickson filed a Motion for Summary Judgment on December 11, 2012 (Doc. #107).  On December 20, 2012, Plaintiff filed an affidavit executed by Arthur Levene, MD, in support of his Certificate of Review.  (Doc. #110).

On May 14, 2013, Dr. MacKerrow and PAC filed a Motion for Summary Judgment. (Doc. #134).  On May 20, 2013, Plaintiff stipulated to dismissing Erickson with prejudice (doc. #138), and the court dismissed her from the lawsuit on May 22, 2013.  (Doc. #139).  On September 3, 2013, Plaintiff filed a Response to Dr. MacKerrow and PAC's Motion for Summary Judgment (Doc. #193), to which they replied on September 18, 2013 (Doc. #200).

On September 24, 2013, this court issued an Order to Show Cause why Dr. Hansa, deceased, through his surviving spouse and successor, Weera-Anong Hansa, should not be dismissed without prejudice from this civil action for failure to file proof of timely service and failure to prosecute.  (Doc. #202).  Plaintiff responded to the Order to Show Cause on October 21, 2013, asking that the United States Marshals Service attempt again to serve Weera-Anong Hansa.  (Doc. #220).

On October 31, 2013, this court held a Status Conference at which the undersigned extended the deadlines to complete fact and expert discovery, designate affirmative and rebuttal experts, and file dispositive motions, and granted Dr. MacKerrow and PAC's oral motion to withdraw their Motion for Summary Judgment.  (*See* Doc. #228).  On December 17, 2013, Plaintiff stipulated to dismissing Dr. MacKerrow and PAC with prejudice.  (Doc. #247).

Defendants filed their Motion for Summary Judgment on May 16, 2014.  (Doc. #280).

Plaintiff filed his Response on July 17, 2014.  (Doc. #285).  On July 21, 2014, Defendants filed a

Motion to Strike the Response for failure to comply with District Judge Daniel's Practice

Standards.  (Doc. #286).  Judge Daniel granted Defendants' Motion on July 24, 2014.  (Doc.

#287).  On July 31, 2014, Plaintiff filed a Motion for Reconsideration (Doc. #289), which Judge

Daniel granted to the extent Plaintiff sought a 60 day extension to file a new Response and

requested permission to refer to his previously filed exhibits.  (Doc. #291).  Plaintiff filed a

conforming Response on October 3, 2014 (Doc. #294), and Defendants filed their Reply on

November 3, 2014.  (Doc. #297).  To date Dr. Hansa, deceased, through his surviving spouse and

successor, Weera-Anong Hansa, has not been served.

## STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–*

*Chem Coal Co., Inc.,* 41 F.3d 567, 569 (10th Cir. 1994).  "A 'judge's function' at summary

judgment is not 'to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014)

(quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)).  Whether there is a genuine

dispute as to a material fact depends upon whether the evidence presents a sufficient

disagreement to require submission to a jury or conversely, is so one-sided that one party must

prevail as a matter of law.  *Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d

1132 (10th Cir. 2000); *Carey v. U.S. Postal Service,* 812 F.2d 621, 623 (10th Cir. 1987).  A fact

is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if

the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

"A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). "The *Haines* rule applies to all proceedings involving a *pro se* litigant, including … summary judgment proceedings." *Id.* at n.3 (citations omitted). The *Haines* rule also instructs that a *pro se* litigant's complaint be "liberally construed to raise the strongest claims the allegations suggest." *Magassouba v. Cross*, No. 08 Civ. 4560(RJH)(HBP), 2010 WL 1047662, at *5 (S.D.N.Y. March 1, 2010) (internal citations omitted). However, the court cannot be a *pro se* litigant's advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008). "Although [o]ur summary judgment standard requires us to view the facts in the light most favorable to the non-moving party[,] it does not require us to make unreasonable inferences in favor of the non-moving party." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008) (quoting *Starr v. Downs,* 117 Fed. App'x. 64, 69 (10th Cir. 2004)).

## ANALYSIS

### A.   Qualified Immunity

Plaintiff sued Defendants in their individual capacities.  (*See* Doc. #98 at ¶¶ 2, 3, 5). Defendants argue they are entitled to qualified immunity, which "shields government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their

conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998) (internal quotation marks omitted). Qualified immunity is an affirmative defense to § 1983 liability (*see Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995)); once a defendant asserts the defense, the plaintiff must demonstrate that qualified immunity is not proper by showing that "(1) the defendant's conduct violated a constitutional right and (2) the law governing the conduct was clearly established at the time of the alleged violation." *DeSpain*, 264 F.3d at 971 (quoting *Baptiste*, 147 F.3d at 1255). The inquiring court may decide which prong to consider first in light of the circumstances of the case at hand. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Defendants argue that Plaintiff cannot satisfy either of the two prongs.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Additionally, a right is clearly established if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts" holds such a right to exist. *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). For the reasons addressed below, this court finds that at this stage in the litigation, Defendant Harding alone is entitled to qualified immunity.

## B.      Eight Amendment Violation

Title 42 U.S.C. § 1983 allows an injured person to seek damages for the violation of his or her federal rights against a person acting under color of state law. *See* 42 U.S.C. § 1983; *see also West v. Atkins*, 487 U.S. 42, 48 (1988). "[T]he treatment a prisoner receives in prison and

the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (citation omitted). "The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including adequate … medical care, and reasonable safety from bodily harm." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (citation omitted). The Eighth Amendment also prohibits "unnecessary and wanton infliction of pain," including "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Prison officials may be liable for an Eighth Amendment violation for "indifference…manifested…in their response to the prisoner's needs or by…intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed." *Estate of Booker v. Gomez*, 745 F.3d 405, 429 (10th Cir. 2014).

"The test for constitutional liability of prison officials involves both an objective and a subjective component." *Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005) (internal quotations and citation omitted). First, the prisoner must "produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata*, 427 F.3d at 751 (internal quotations and citation omitted). A delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Oxendine v. Kaplan,* 241 F.3d 1272, 1276 (10th Cir. 2001) (quotations and citation omitted). The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman,* 254 F.3d 946, 950 (10th Cir. 2001) (citation omitted).

Second, under the subjective component, the prisoner must establish deliberate indifference to his serious medical needs by "present[ing] evidence of the prison official's culpable state of mind." *Mata*, 427 F.3d at 751. "Deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104 (internal quotation and citation omitted). The Tenth Circuit recognizes two types of conduct constituting deliberate indifference. The first occurs when a medical professional fails to properly treat a serious medical condition; the second occurs when a prison official prevents an inmate from receiving treatment or denies him access to medical personnel capable of providing treatment. *See Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000) (internal citations omitted). A prison health official who serves "'solely…as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill the gatekeeper role.'" *Mata*, 427 F.3d at 751 (quoting *Sealock*, 218 F.3d at 1211). The subjective standard requires a state of mind "akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837) (internal quotations and further citation omitted). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Self*, 439 F.3d at 1231 (internal quotations omitted). The Tenth Circuit has held that where a prison official is aware a prisoner is suffering a heart attack and acts with deliberate indifference in refusing or delaying the prisoner's access to medical care, the official may be liable for an Eighth Amendment violation. *See Sealock*, 218 F.3d at 1210-11.

Mr. Glasser claims he suffered deliberate indifference to a serious medical need when Defendants King and Harding refused him access to medical care until after the prison count, despite knowing that he was experiencing symptoms that could indicate a cardiac event; and when Defendant Walsh delayed dispatching an ambulance for 60 to 90 minutes despite evidence that Plaintiff was suffering a heart attack.  Defendants appear to concede that Plaintiff's heart attack constitutes a sufficiently serious medical need.  (*See generally* Doc. #280 at pp. 17-21). Instead, King and Walsh argue that no evidence exists to demonstrate they acted with deliberate indifference.  Harding argues that Plaintiff failed to allege that he personally participated in a constitutional violation and the evidence of record does not show otherwise.

"A prisoner may satisfy the subjective component [of an Eighth Amendment violation] by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of her condition." *Mata*, 427 F.3d at 755.  The Tenth Circuit has held that "even a brief delay may be unconstitutional," citing the Seventh Circuit's holding that a fifteen-minute delay in treating an inmate in cardiac arrest may violate the Eighth Amendment.  *Id.* (citing *Lewis v. Wallenstein,* 769 F.2d 1173, 1183 (7th Cir. 1985)).  *See also Sealock*, 218 F.3d at 1210 (delay of "several hours" in taking inmate with chest pains to hospital violated Eighth Amendment).  This court will construe the factual record and reasonable inferences therefrom in the light most favorable to the non-moving party.  *See Mann v. United States*, 204 F.3d 1012, 1016 (10th Cir. 2000).

1.  Defendant King

a.  *Allegations of Conduct During the Prison's Count*

Defendant King testified that her "responsibility as desk nurse [on March 26, 2010] was to allow an inmate to come to clinic if [she] was made aware of symptoms which would indicate

a cardiac event." (King Deposition, Doc. #280-3 at TR:12:7-10). She described symptoms of a cardiac event as including: fainting, sweating, fatigue, anxiety, chest pain, jaw pain, arm pain, and back pain. (*See* King Deposition, Doc. #280-3 at TR:13:2-5). King explained that "[b]ased on the policies of the prison," an inmate required "a really good reason[]" to visit the medical clinic during count, such as "if someone were injured and bleeding, if someone was demonstrating symptoms that indicated some kind of life-threatening event, if they had collapsed, if they were complaining of chest pain…." (King Deposition, Doc. #280-3 at TR:8:16-25).

At 11:20 am, Plaintiff complained to Sergeant Hansen of "shortness of breath, dyspnea, lethargy, dizziness, radiating chest pain, chest pressure, pain and numbness in both triceps, feelings of indigestion," and asked to be taken to the prison's medical clinic. (Doc. #98 at ¶¶ 12-13; Glasser Affidavit, Doc. #285-3 at ¶ 14). No one disputes that Hansen failed to relay these exact symptoms to Defendant King.[7] (*See* Doc. #280 at ¶¶ 18, 46; Doc #294 at pp. 2, 3). In her first phone call to King, Hansen reported that Plaintiff was experiencing "tingling, heaviness" in his arms, that he generally felt unwell, and that he had "push[ed] [himself] harder on the yard…." (Hansen Deposition, Doc. #280-2 at TR:7:15-8:7, 11:7-16). King recalled hearing that Plaintiff requested medical attention because "he had been working out fairly strenuously," was "feeling dizzy and light-headed," and felt that "something was wrong." (King Deposition, Doc. #280-3 at TR:5:21-6:5). King responded that inmates often overextend themselves during recreation, become "dehydrated and fatigued, and that some rest and fluids was the first line of recommendations to relieve the situation." (King Deposition, Doc. #280-3 at TR:6:9-16). She

---

[7] Plaintiff's concessions are solely for the purpose of responding to Defendants' Motion for Summary Judgment. (*See generally* Doc. #294).

then told Hansen that if Plaintiff failed to feel better, or felt worse, he would be seen when "count was cleared." (*Id.* at TR:6:21-24).

Upon learning that he could not visit the clinic at that time, Plaintiff asked Sergeant Hansen to contact Defendant Harding directly. (Glasser Affidavit, Doc. #285-3 at ¶¶ 17, 18). Hansen instead telephoned King a second time and told her that Plaintiff still felt poorly and continued to ask to visit the clinic. (King Deposition, Doc. #280-3 at TR:7:3-7). King asked Hansen if Plaintiff's situation had deteriorated, and recalls hearing that his condition was not worse but had not improved. (*See id.* at TR:7:7-10). King responded that Plaintiff would have to wait until after the count. She testified that where a prisoner's condition did not appear from a telephone conversation to constitute an emergency, and barring "any further worsening of symptoms," she would insist the prisoner wait to visit the clinic until count had cleared. (King Deposition, Doc. #280-3 at TR:9:2-7).

Officers Hansen, Aranda, and Aultman returned to Plaintiff at approximately 11:30 am to report that the clinic would not see him until count had cleared, and stated they would continue to check on him but could offer no other assistance. (Glasser Affidavit, Doc. #285-3 at ¶ 19).

The count continued for 30 minutes. During this time, the officers returned to Plaintiff's cell "three or four times" and Plaintiff continued to request medical attention. (Doc. #98 at ¶ 16; Glasser Affidavit, Doc. #285-3 at ¶ 21). The prison finished its count at 11:55 am, at which time Plaintiff was permitted to walk to the clinic. At no time prior to Plaintiff's arrival at the clinic did anyone report to King that he was experiencing chest pain. (*See* Doc. #280 at ¶¶ 18, 46; Hansen Deposition, Doc. #280-2 at TR:24:22-24; King Deposition, Doc. #280-3 at TR:16:1-21).

Dr. Levine attested that "physical exertion, such as running, might be expected to bring on episodes of ischemia…[but] these symptoms would almost always be expected to dissipate

16

within a very short time span, perhaps only minutes, after the cessation of exercise," and that "chest pains or pressure, shortness of breath, lightheadedness, and dizziness" would "dissipate rapidly upon cessation" of the activity. (Levine Affidavit, Doc. #285-5 at ¶¶ 32-33). Dr. Levine further attested that the persistence of these symptoms beyond 15 minutes after the person had ceased exercising is "highly suggestive of myocardial infarction and should be evaluated and treated as such immediately." (*Id.* at ¶ 34). Plaintiff claims that his symptoms of dizziness, light-headedness, tingling and a sense of heaviness in his arms, and general malaise had been present for 45 minutes when Defendant King first refused to grant him admittance to the clinic. A genuine question of material fact exists as to whether Plaintiff's symptoms as reported to Defendant King should have alerted her to Plaintiff's serious medical need.

### b.   Allegations of Conduct Following the Prison's Count

King testified that Plaintiff identified himself when he arrived at the clinic but did not state he was experiencing chest pains or a heart attack. (*See* King Deposition, Doc. #280-3 at TR:16:1-21). Plaintiff alleges that after he arrived at the clinic and identified himself he stated to King, "I think I'm having a heart attack." (Glasser Affidavit, Doc. #285-3 at ¶ 23). He alleges that King responded, "[w]e're kinda busy right now, go sit out there and wait." (*Id.*) Plaintiff further alleges that he waited 20 minutes (*see* Doc. #98 at ¶ 19; King Deposition, Doc. #280-3 at TR:25:14-17), and that Nurse Apodaca saw him at 12:25 pm, which is when he signed the clinic's logbook. (Glasser Affidavit, Doc. #285-3 at ¶ 26).[8]

King was not responsible for Plaintiff's medical care because she was stationed behind the clinic's front desk, and Plaintiff concedes that she informed the other nurses in the clinic that he was a self-declared emergency and needed to be seen. (*See* Doc. #280 at ¶¶ 55, 57, Doc. #294

---

[8] Plaintiff also alleges that he arrived at the clinic at 12:05 pm (Glasser Affidavit, Doc. #285-3 at ¶ 23), and was seen at 12:15 pm. (Doc. #294 at p. 6, ¶ 83). The record indicates, however, that Plaintiff did not leave his cell house until 12:05 pm. (*See* Doc. #297 at ¶¶ 53-54 (citing Doc. #1 at ¶ 41; Doc. #280-3 at p. 19)).

at ¶¶ 55-57).   However, Plaintiff alleges King failed to fulfil her gatekeeper role by refusing to immediately facilitate medical attention once he informed her of his chest pain.   Furthermore, King admits that reports of chest pain constitute an emergency.   (*See* King Deposition, Doc. #280-3 at TR:8:16-25, 13:2-5).   Accordingly, I find a genuine question of material fact exists as to whether King had knowledge of Plaintiff's serious medical need once he arrived at the clinic.

　　　2.   Defendant Walsh

　　　Defendant Walsh testified that the initial examination of Plaintiff and the first EKG were performed by nursing staff at the clinic.   The nursing staff compiled "[its] own subjective history, look[ed] at [Plaintiff's] chart," checked his vital signs, and then prepared and conducted the EKG.   (Doc. #280 at ¶ 60; Walsh Deposition, #280-4 at TR:14:15-22, 15:10-14).   Walsh surmises that between 20 and 30 minutes passed during which the nursing staff performed an initial examination of Plaintiff, determined that an EKG was necessary, administered the EKG and read the results, and located Walsh.   (*See* Doc. #280 at ¶ 61; Walsh Deposition, Doc. #280-4 at TR:15:3-6).   Walsh attended to Plaintiff and performed his own examination and interview once he was informed that Plaintiff needed his attention.   (*See* Doc. #280 at ¶¶ 62, 63, 65; Walsh Deposition, #280-4 at TR:11:21-12:9).   He claims he concluded "within the first few minutes after gathering the information" that Plaintiff "needed evaluation and potential treatment that was not accessible in [the FCF] facility."   (Doc. #280 at ¶¶ 69, 70, 71; Walsh Deposition, Doc. #280-4 at TR:13:7-11, 35:9-12).   He informed the clinic's correctional officer that he intended to send Plaintiff to a different facility by ambulance.   He further testified that his decision to send an inmate "out emergent" initiated a "cascade of events to transport somebody out armed" (Doc. #280-4 at TR:34:21-24), and that he has no control over when a prisoner leaves the facility after

he orders prison staff to dispatch an ambulance.  (*See* Doc. #280 at ¶ 75; Walsh Deposition, Doc. #280-4 at TR:35:18-36:9).[9]

Walsh testified that following his examination and interview, he began to treat Plaintiff by preparing a "suction machine," while intravenously administering oxygen, aspirin, and nitroglycerin.  (Doc. #280 at ¶ 67; Walsh Deposition, Doc. #280-4 at TR:12:1-25).  He testified that he administered the second EKG at 1:55 pm, when he was informed that the ambulance had arrived.  He claims the second EKG was administered 37 minutes after the results of the first EKG were generated.[10]  (*See* Walsh Deposition, Doc. #280-4 at TR:11:5-11, 36:24-37:2).

Walsh claims that Plaintiff never complained of chest pain to him, that none of the nurses reported Plaintiff's complaints of chest pain to him, and that Plaintiff fabricated the symptom of chest pain for the purpose of filing this lawsuit.  (*See* Doc. #280 at ¶ 66; Walsh Deposition, Doc. #280-4 at TR:19:10-24, 29:22-24).  He testified that even if Plaintiff had spoken of chest pain, he would not have altered his choice of treatment because "[o]ne piece of information does not dictate how the treatment is run."  (Walsh Deposition, Doc. #280-4 at TR:34:25-35:5).  Walsh claims that no more than 40 minutes elapsed between when he attended to Mr. Glasser and when the ambulance arrived.  (Doc. #280 at p. 19).

Mr. Glasser disputes most of the above testimony.  Plaintiff alleges he told both Nurse Apodaca and Defendant Walsh that he had "bilateral radiating chest pains across his upper chest, and was experiencing chest pressure and pains—among other relevant symptoms."  (Doc. #294 at ¶ 66).  Plaintiff further alleges that the first EKG was administered at 12:40 pm, and that

---

[9] Specifically, Walsh testified that pursuant to the prison's routine policy for summoning an ambulance he informs the clinic officer of the request and the clinic officer contacts the shift commander, who places the call to dispatch. "So there would be some time delay between the time that the clinic officer was notified, whenever they decided to call the shift commander, then the shift commander has to gather together a transport team," which required an armed transport for Plaintiff.  (Walsh Deposition, Doc. #280-4 at TR:15:20-16-12).

[10] The parties agree that the date and time stamps found on the printed results of the two EKG tests are incorrect.  (*See* Doc. #280-4 at TR:10:20-11:11).

Walsh acknowledged to him that the results of this EKG indicated he was experiencing a heart attack. (*See* Glasser Affidavit, Doc. #285-3 at ¶ 30).  (*See also* Walsh Deposition, Doc. #280-4 at TR:35:6-12) ("Q: [W]as there a point that you realized Mr. Glasser might be having a heart attack? A: "Certainly within the first few minutes after gathering the information, that's when I decided that [Plaintiff] needed evaluation and potential treatment that was not accessible in our facility…").  Plaintiff claims Walsh administered a dose of nitroglycerine at approximately 12:50 pm (Glasser Affidavit, Doc. #285-3 at ¶ 31), and administered a second EKG at approximately 1:15 pm.  (*Id.* at ¶ 32).  Walsh reported to Plaintiff that his EKG results were improved but it appeared he was still experiencing a heart attack, and suggested they employ a "wait and see" strategy.  (Glasser Affidavit, Doc. #285-3 at ¶¶ 33, 34).

The ambulance arrived at 1:56 pm, and the record of the ambulance dispatch demonstrates the Emergency Medical Services ("EMS") was requested at 1:45 pm.  (Doc. #285-14; Doc. #280 at ¶ 77).  Plaintiff alleges this ambulance ticket establishes that one hour passed from the time Walsh viewed the results of the first EKG and opined that Plaintiff was experiencing a heart attack and when he ordered an ambulance.  (*See* Glasser Affidavit, Doc. #285-3 at ¶¶ 26-30, 32).[11]  Additionally, Walsh noted "other chest pain" and the need for "a further work-up" in the Assessment section of Plaintiff's Ambulatory Health Record (Doc. #285-13); and the Weekly Duty Officer's Observation Form demonstrates that the Health Service Administrator, Lynn Erickson, contacted the Duty Officer at 2:20 pm on March 26, 2010 to inform him that Plaintiff had been transported to the hospital for chest pains.  (*See* Doc. #285-18).  Plaintiff did not speak with Erickson that afternoon or otherwise communicate his chest pain to her.  (*See* Doc. #294 at p. 15, ¶ 57).  Finally, Plaintiff alleges that no suction machine was

[11] Glasser also submitted the affidavit of fellow inmate, James H. Ginn, as testimonial evidence that an ambulance typically arrives in less than 20 minutes after the medical clinic sends for one.  (*See* Doc. #285-11 at ¶¶ 4-8).

prepared, he was given a single aspirin and "a single sublingual dose of Nitroglycerin," and an IV was inserted into him by a nurse only after he was shackled and the ambulance had arrived on premises. (Doc. #294 at p. 5, ¶ 67; Doc. #285-13). Plaintiff claims that over three hours passed between symptom onset at 10:40 am and when Walsh summoned the EMS (Doc. #98 at ¶ 23), and that Walsh's delay in sending him to an appropriate facility resulted in permanent cardiac damage. (*See* Doc. #294 at p. 6, ¶ 85).[12]

Dr. Levine attested that the results of the first EKG along with Plaintiff's professed symptoms should have indicated "an acute myocardial infarction requiring immediate emergency medical intervention," (Levine Affidavit, Doc. #285-5 at ¶¶ 15, 16), and that "[a] patient found to be in this condition who is not in an appropriately equipped emergency room environment should be transported to one immediately." (*Id.* at ¶ 16). Dr. Creany testified that the first EKG showed "cause for concern about [Mr. Glasser's] heart," and that "it wouldn't have been unreasonable" to order an ambulance following the abnormality evidenced by the test results. (Creany Deposition, Doc. #285-8 at TR:25:10-21). Dr. Creany also testified that the EKG "is just one piece of that puzzle," in determining what treatment is appropriate. (*Id.* at TR:23:25-24:1). Dr. MacKerrow testified that the first EKG "show[ed] signs suggestive of possibly an evolving heart attack in the front wall of the heart." (MacKerrow Deposition, Doc. #285-7 at TR:16:16-21).

The evidentiary record as discussed herein presents a close case. I am constrained by Fed. R. Civ. P. 56 to construe the facts in the light most favorable to Plaintiff, and therefore find a genuine question of material fact exists as to when Defendant Walsh was alerted to Plaintiff's condition, the extent of his delay in summoning the ambulance, and whether that delay equates

---

[12] To the extent Defendants argue that any delay resulting from their inaction did not cause Plaintiff injury, Plaintiff has produced factual evidence from which a jury could conclude "that the delay occasioned by [their] inaction unnecessarily prolonged [his] pain and suffering." *Sealock*, 218 F.3d at 1210 n. 5.

to deliberate indifference.  However, this Recommendation does not preclude Defendants from exercising their right to request judgment as a matter of law under Fed. R. Civ. P. 50(a) at any time prior to submission to the jury, should this civil suit proceed to trial.

    3.  Defendant Harding

    The plaintiff must allege that a defendant personally participated in the Eighth Amendment violation.  *See Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (citing *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976)).  Mr. Glasser did not allege such personal participation on behalf of Defendant Harding.  Indeed, Glasser states in his Response to Defendants' Motion for Summary Judgment that according to the available information, "it is apparent that Defendant Lieutenant James Harding played no appreciable role in creating the delays in [Plaintiff's] medical care," and expresses his wish to dismiss all claims against Defendant Harding.  (Doc. #294 at p. 24).  Accordingly, Defendants' Motion for Summary Judgment should be granted as to any claims pertaining to Lieutenant Harding.

**C.    State Law Claims**

    Defendants argue they are entitled to summary judgment on Plaintiff's state law claims of Professional Negligence and Outrageous Conduct and/or the Intentional or Negligent Infliction of Emotional Distress on the basis that the court should decline pendant or supplemental jurisdiction over the claims and that they are barred by the Colorado Governmental Immunity Act ("CGIA"), C.R.S. § 24-10-101, *et seq.*  The exercise of pendant jurisdiction is appropriate because this court finds that Plaintiff has identified genuine disputes of material fact as to whether Defendants King and Walsh acted with deliberate indifference.  Furthermore, the Plaintiff's state law claims do not raise novel or complex issues concerning Colorado law, do not predominate over the federal claim, and do not present "exceptional circumstances…that warrant

22

declination of jurisdiction."  28 U.S.C. § 1367(b).  However, Plaintiff's state law claims are barred under the CGIA.

The CGIA provides:

> [a] public employee shall be immune from liability in any claim for injury ... which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing injury was willful and wanton...

C.R.S.A. § 24-10-118(2)(a).  Defendants King and Walsh were public employees on March 26, 2010 and thus subject to CGIA immunity unless Plaintiff can show that Defendants acted willfully and wantonly.  *Robinson v. City and County of Denver,* 39 F. Supp. 2d 1257, 1263 (D. Colo. 1999).  Plaintiff may demonstrate that Defendants acted willfully and wantonly under the CGIA by establishing that they "purposefully pursued a course of action or inaction that [they] considered would probably result in the harm to" him.  *Castaldo v. Stone,* 192 F. Supp. 2d 1124, 1141 (D. Colo. 2001).

Plaintiff pled in his SAC that "the willful and wanton actions of both Defendants King and Walsh were a direct and proximate cause of [his] injuries."  (Doc. #98 at ¶ 63).  However, Plaintiff does not provide evidence in his Response to Defendants' Motion for Summary Judgment that Defendants acted with the requisite knowledge.  Rather, Plaintiff argues only that his state claims should go forward pursuant to the statutory waiver of immunity found in Colo.Rev.Stat.Ann. § 24-10-106(1)(b), which provides that sovereign immunity is waived by a public entity in an action for injuries resulting from the operation of a correctional facility.  Defendants contend Plaintiff falls within an exception to this waiver of immunity.  Colo.Rev.Stat.Ann. § 24-10-106(1.5)(a) instructs: "[t]he waiver of sovereign immunity created in paragraphs [(1)(b)] of this section does not apply to claimants who have been convicted of a

crime and incarcerated in a correctional facility or jail pursuant to such conviction."  Plaintiff

does not dispute that he was and currently is incarcerated as the result of a conviction, but argues

that subsection (1.5)(a) applies only to public entities.   Plaintiff offers no support for that

distinction.   Moreover, courts in this district have applied subsection (1.5)(a) to claimants who

have been convicted of a crime and subsequently incarcerated regardless of whether the

defendant is a public entity or public employee.  *See, e.g., Garcia v. Chamjock*, 11-cv-00263-

PAB-MEH, 2012 WL 638145, at *3 (D. Colo. February 27, 2012).   Plaintiff also contends that

this court should follow the reasoning in *State v. Nieto*, 993 P.2d 493, 506-7 (Colo. 2000), in

which the Colorado Supreme Court held the CGIA waiver of immunity applied to public

employees working in a state prison facility.   However, *Nieto* concerned conduct that arose prior

to 1994, the year in which subsection (1.5)(a) was adopted.  *See Nieto*, 993 P.2d at 497-98.  *See

also Norsby v. Jensen*, 916 P.2d 555, 561 (Colo. App. 1995) ("Because plaintiff's injuries

occurred in 1992 and he filed his claim in 1993…[subsection (1.5)(a)] does not apply here.").

Accordingly, Defendants are entitled to governmental immunity as provided by the CGIA.

Finally, Plaintiff argues that Defendants "waived the defense of governmental immunity"

by failing to raise the CGIA argument in their Response to Plaintiff's Motion for Waiver of the

Certificate of Review Requirement.   (Doc. #294 at p. 29).   However, immunity serves as a

jurisdictional bar and may be raised at any point leading up to trial.  *See Fogg v. Macaluso*, 892

P.2d 271, 276-77 (Colo. 1995) ("[Section 24-10-108] is entitled 'Sovereign immunity a bar' and

states that sovereign immunity 'shall be a bar' to any action that lies in tort or could lie in tort.").

"[I]mmunity from suit means that a plaintiff cannot legally file a lawsuit naming that person or

entity as a defendant."   *Nieto*, 993 P.2d at 507 (citing § 24–10–108, 7 C.R.S. (1999)) (providing

that sovereign immunity shall be a bar to any action against a public entity).   In any event,

24

Defendants asserted governmental immunity under the CGIA as an affirmative defense in their Answer, thereby alerting Plaintiff to the argument.  (Doc. #104 at p. 11).  I find Defendants' Motion for Summary Judgment should be granted as to Plaintiff's state law claims.

**CONCLUSION**

For the forgoing reasons, this court RECOMMENDS that Defendants' Motion for Summary Judgment (Doc. #280) be GRANTED in part and DENIED in part.  This court further RECOMMENDS that Defendant Harding and Defendant Hansa, deceased, through his surviving spouse and successor, Weera-Anong Hansa, be dismissed.

**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and

25

recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 14th day of January, 2015.

BY THE COURT:

s/Craig B. Shaffer
United States Magistrate Judge